UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

————————————————

JIMDI, INC.,

       Plaintiff,

v.                                                                    Case No. 1:07-CV-209

TWIN BAY DOCKS AND PRODUCTS,
INC. and ROBERT SERSCHEN,                        HON. GORDON J. QUIST

       Defendants.

_____/

## OPINION

     Plaintiff, Jimdi, Inc. ("Jimdi"), filed its complaint in this case on March 5, 2007, alleging that

Defendants, Twin Bay Docks and Products, Inc. ("Twin Bay") and Robert Serschen[1] ("Serschen")

are using its federally-registered trademark in violation of the Lanham Act, 15 U.S.C. § 1051, *et seq*.,

and the common law. Jimdi also alleged various other state law claims for violation of the Michigan

Consumer Protection Act, M.C.L.A. § 445.901 *et seq*., breach of contract, tortious interference with

contractual relations, business defamation, unjust enrichment, and conversion. Jimdi moved for a

temporary restraining order and a preliminary injunction. On March 7, 2007, the Court entered an

order denying the motion for a temporary restraining order and setting a hearing on the motion for

preliminary injunction. The Court held a hearing on the motion for preliminary injunction on March

26, 2007. At the conclusion of the hearing the Court took the matter under advisement and granted

Jimdi the opportunity to file a reply brief, which it has done. For the reasons set forth below, the

Court will deny the motion.

_____

[1]Throughout this Opinion, the Court refers to Twin Bay and Serschen interchangeably, as both parties have done
so in their briefs and also in their dealings with each other.

# I. Facts

Jimdi is a Michigan corporation engaged in the business of designing, manufacturing, and selling injection-molded modular deck flooring panels for use in the animal nursery and farrowing industry. These panels contain a herringbone or chevron-shaped pattern of slots. Examples of this pattern are shown in Jimdi's exhibits 2a-2c and 5. Jimdi has sold these panels under various names from 1989 through the present. From 1989 until 1996, Jimdi sold deck flooring panels exemplified by exhibit 2b to the public under the name "Poly 'T'" brand. From 1990 though the present, Jimdi has manufactured and sold deck flooring panels exemplified by exhibit 2a to distributors for resale to the public under the "Sure Step" brand. From about 1999 through the present, Jimdi has manufactured and sold panels exemplified in exhibit 5 to resellers for sale to the public throughout the country. On March 24, 1998, the United States Patent and Trademark Office granted Jimdi's application for registration of its herringbone pattern for floor panels on the principal register, evidenced by registration no. 2,145,723. Since 1998, Jimdi has included the registered trademark symbol ®, its common law trademark "Sure Step", and a notice of protection under United States Patent No. D 395,713 on all of the panels it has manufactured bearing the herringbone design.

Twin Bay has been engaged in the manufacture of various products relating to the boating industry, including dock flooring, dock components, and dock accessories, since approximately 1989. Twin Bay initially manufactured dock flooring with cedar and later added a vinyl flooring product manufactured by Thru-Flow, Inc. of Canada. When Twin Bay became dissatisfied with the dock panels that Thru-Flow produced, Serschen, Twin Bay's president, approached Jimdi about manufacturing dock flooring for Twin Bay. Because the dock panels would be of a different length and width than other panels Jimdi manufactured, a new plastic injection-molding tool ("Tool") was required to make the panels. The parties agreed that Jimdi would build the Tool and that Twin Bay

2

would make a financial investment in the Tool in order to ensure Twin Bay's commitment to ordering the product.

The remaining details regarding the manufacture and rights to use the Tool are somewhat in dispute. According to Richard Schrotenboer, Jimdi's president, the parties agreed that Jimdi would reduce the per-piece cost of each panel that Jimdi produced for Twin Bay, so that over time, Twin Bay would fully recoup its investment in the Tool. (Schrotenboer Aff. ¶ 18.) Schrotenboer states that Jimdi did not agree that it was restricted to making dock panels using the Tool exclusively for Twin Bay and that it was never restricted in manufacturing and selling dock flooring panels with its trademarked pattern to other retailers besides Twin Bay. (*Id.* ¶¶ 19-20.) Schrotenboer also states that on at least two occasions prior to April 5, 2004, Serschen claimed that Serschen and/or Twin Bay owned the tool and that Jimdi always refuted these assertions until Jimdi became concerned about losing Twin Bay's business. (*Id.* ¶¶ 24-25.)

Serschen's version differs in some respects. He states that when the parties first began discussing Twin Bay's purchase of flooring, he gave Schrotenboer a sample of Thru-Flow's unpatented pattern to use in building the Tool because Schrotenboer told him that the herringbone pattern in Jimdi's panels was trademarked, however, when Jimdi built the Tool, it used Jimdi's herringbone design rather than the Thru-Flow design. (Serschen Aff. ¶¶ 11, 16.) He says that the parties reached an agreement in January 2001 whereby Jimdi would build the Tool, Twin Bay would make the monetary investment to build the Tool, and Jimdi would give Twin Bay discounted pricing on panels that Jimdi produced for Twin Bay and rebates on panels that Jimdi manufactured and sold to its other customers using the Tool. (*Id.* ¶¶ 12-13.) Serschen states that he told Schrotenboer that he wanted to purchase the Tool so that Twin Bay could manufacture its own panels or could contract with another company to make them at some point in the future, and that he never agreed that Twin

3

Bay could not use the Tool. (*Id.* ¶¶ 14-15.) Finally, Serschen states that after almost five years had gone by, he wanted to take possession of the Tool in order to have another manufacturer produce the dock panels but that Schrotenboer objected to Twin Bay removing the Tool from Jimdi's facility. (*Id.* ¶¶ 17-18.)

On April 5, 2004, the parties entered into a two-page agreement captioned "Purchase Agreement Between Robert Serschen and Jimdi, Inc." (the "Agreement"). The Agreement provided, among other things, that Serschen would purchase the Tool and a "Dock Cleat tool" for the amounts of $53,000 and $12,000, respectively, and that Serschen agreed to remove the name "Sure-Step" and the Patent Number from the Tool, the cost of which would be split evenly by Jimdi and Serschen. The Agreement also provided that Jimdi could purchase dock flooring from Serschen at $.50 over Serschen's cost through January 1, 2005, and at the rate of $1.00 over Serschen's cost for two years thereafter. The Agreement is silent on the issue of Jimdi's trademark rights. It is also silent on the issue of possession of the Tool, although Schrotenboer, who drafted the Agreement, states that Jimdi agreed to sell Serschen the Tool "provided that the Tool remained in Jimdi's possession and that Jimdi produce private label deck flooring panels for Serschen." (Schrotenboer Aff. ¶ 26.) Serschen, on the other hand, says that he wanted to take possession of the Tool because he desired to contract with another manufacturer to produce the dock panels and because Jimdi did not have the capability to manufacture a new product that Serschen wanted to manufacture, and he preferred to have the same manufacturer produce both products. (Serschen Aff. ¶ 17.) In any event, it is undisputed that after the parties signed the Agreement: (1) Serschen paid the purchase price for the Tool, (*id.* ¶ 20); (2) that until October 23, 2006, Jimdi continued to manufacture flooring panels for Twin Bay using the Tool containing Jimdi's trademarked herringbone pattern, the Sure Step brand name, and the patent and trademark notices, (Schrotenboer Aff. ¶ 30); and (3) that the Tool remained in Jimdi's possession until October 23, 2006. (*Id.* ¶ 34.)

4

In October 2006, Serschen decided to remove the Tool from Jimdi's facility. Schrotenboer states that he received a letter dated October 6, 2006, from Twin Bay's and Serschen's counsel notifying Jimdi that Serschen intended to remove the Tool from Jimdi's possession and place it with another manufacturer, Morren Plastic Molding, Inc. (*Id.* ¶ 32.) According to Schrotenboer, Jimdi objected to the removal of the Tool from its facility, but Serschen still made arrangements to have the Tool removed from Jimdi's facility on October 23, 2006. (*Id.* ¶¶ 33-35.) Schrotenboer says that after Serschen removed the Tool, Schrotenboer made several attempts to have the Tool removed to Jimdi's facility, without success. (*Id.* ¶ 36.) Twin Bay and Serschen, of course, present a different story. They have presented an affidavit from Nelson Morren, the owner and president of Morren Plastic Molding, Inc., who states that after Serschen contacted his company about producing dock flooring panels for Twin Bay, he had a telephone conversation with Schrotenboer regarding arrangements for Morren Plastic to pick up the Tool from Jimdi. (Morren Aff. ¶¶ 3,4, and 6.) Morren says that during their conversation, they discussed the requirement that his company would not make any parts from the Tool unless Jimdi's logo and patent number were removed from the Tool, and he wrote a letter to Schrotenboer confirming this understanding. (*Id.* ¶¶ 7-8.) Morren further states that when a Morren Plastic representative arrived at Jimdi's facility to pick up the Tool, Jimdi had the Tool ready for pick up, and a Jimdi employee apparently assisted the Morren Plastic representative in loading the Tool into the vehicle for transportation. (*Id.* ¶ 9.)

Subsequently, Jimdi attempted to order dock flooring panels from Twin Bay, but it appears that Twin Bay refused to fill Jimdi's order, possibly because the parties were unable to reach an agreement regarding the purchase price. Schrotenboer states that he informed Serschen that Serschen did not have the authority to produce flooring panels containing Jimdi's pattern. (Schrotenboer Aff. ¶ 42.) Jimdi filed the instant suit after Serschen informed dealers exhibiting

5

Jimdi's Sure Step deck flooring panel at the Grand Rapids Boat Show that Jimdi no longer had authority to manufacture or sell the product.  (*Id.* ¶ 46.)

## II.  Motion Standard

In ruling on a motion for a preliminary injunction, a court considers four factors: "(1) whether the plaintiffs are likely to succeed on the merits; (2) whether the plaintiffs will suffer irreparable harm in the absence of an injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) whether the issuance of the injunction is in the public interest." *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997).  These are factors to be balanced, not prerequisites that must be met.  *See Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994).  A district court need not make specific findings on each of the four factors if fewer factors are dispositive of the issue.  *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).  Even if a plaintiff fails to show a strong or substantial likelihood of success on the merits, a court may grant injunctive relief where the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982).  Stated slightly differently, "[w]here the three factors other than likelihood of success all strongly favor issuing the injunction, a district court is within its discretion in issuing a preliminary injunction if the merits present a sufficiently serious question to justify a further investigation." *Little Caesar Enters., Inc. v. R-J-L Foods, Inc.*, 796 F. Supp. 1026, 1030 (E.D. Mich. 1992).

## III.  Discussion

**A.    Likelihood of Success**

Apart from other issues that Defendants raise, whether Jimdi has shown a likelihood of success on the merits entails two separate facets of analysis.  First, the Court must consider whether

6

Jimdi has shown a likelihood of success regarding its trademark and trade dress infringement and/or dilution claims.  Second, even if Jimdi has shown that it is likely to prevail on its claims, the Court must consider whether Jimdi is likely to prevail on the issue raised by Defendants of whether Jimdi's sale of the Tool to Serschen and/or Twin Bay pursuant to the Agreement operated as either an assignment of Jimdi's trademark rights, a license of those rights (implied or naked), or some form of consent or acquiescence.

### 1.    Trademark Infringement

The Lanham Act prohibits the unauthorized use in commerce of any reproduction of a registered mark in connection with the sale, advertising or distribution of goods or services which could cause confusion relative to the goods or services.  15 U.S.C. § 1114.  "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."  *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).  In order to assess the likelihood of confusion, the Sixth Circuit examines eight factors: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care and sophistication; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines using the marks.  *See Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1984).

> Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case.  But a thorough and analytical treatment must nevertheless be attempted.  *The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.*

*Daddy's Junky Music Stores, Inc.*, 109 F.3d at 280 (quoting *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.* 931 F.2d 1100, 1104 (6th Cir. 1991)) (emphasis added).

### a.    Strength of the Mark

The strength of a mark is relevant because it provides some measure for determining the extent of possible confusion.  Generally, "[t]he stronger the mark, all else being equal, the greater the likelihood of confusion." *Homeowners Group, Inc.*, 931 F.2d at 1107.  Courts often determine the strength of trademarks by characterizing them as falling into one of several categories: (1) arbitrary and fanciful; (2) suggestive; (3) descriptive; and (4) generic.  *See Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593 (6th Cir. 1989).  Arbitrary and fanciful marks are the strongest and most distinctive marks.  *See Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987).  An arbitrary mark has a recognized meaning but its use in connection with the product or service is unrelated to its meaning, such as APPLE computers or CAMEL cigarettes.  *See id.*  "A 'fanciful' mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned." *Id.* Examples include "Xerox" and "Kodak".  *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003).  A suggestive mark  suggests some ingredient or characteristic of the product or service, such as "CITIBANK, which connotes an urban or modern bank, or GOLIATH, for wood pencils, connoting a large size." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996).  A mark is descriptive if it describes "the intended purpose, function or use of the goods . . . the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir. 1988).  Proof of secondary meaning is required in order for a descriptive mark to be entitled to trademark protection.  *See DeGidio v. West Group Corp.*, 355 F.3d 506, 513 (6th Cir. 2004).  Finally, a generic term is the weakest type of mark and is usually a common term used to describe or refer to the product.  *See Champions Golf Club, Inc.*, 78 F.3d at 1117.  An example is grape leaf designs, which have become

8

generic emblems for wine. *See Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d

1042, 1048-49 (9th Cir. 1998). Such terms cannot be protected as trademarks. *See id.* at 1048.

The problem with attempting to place the mark at issue in this case – the repeating

herringbone or chevron design – into one of the categories identified above is that it is a design or

pattern that does not have a meaning that may be attributable to the product. *See Nature's Life, Inc.*

*v. Renew Life Formulas Inc.*, No. 2:05 CV 162, 2006 WL 62829, at *6 (D. Utah Jan. 11, 2006)

(stating that "the marks are designs, not word marks, which are ill suited for the 'conceptional

strength' analysis [arbitrary, fanciful, etc.], since designs (unlike words) do not have a 'meaning' that

can be applied to the goods and classified as 'generic,' 'descriptive,' or 'suggestive'"). Jimdi cites

the above categories, but does not even suggest that the mark falls into any of them. Defendants

contend that the chevron pattern is common or generic, but, as noted, such a classification is not

helpful in this case because nothing before this Court suggests that the herringbone pattern is

commonly associated with deck flooring such that it could constitute a generic symbol or emblem,

as the grape leaf has become for wine. Jimdi, on the other hand, noting that its mark is incontestable

pursuant to 15 U.S.C. § 1065, invokes the rule that "an incontestable mark 'is presumed to be at least

descriptive with secondary meaning, and therefore a relatively strong mark.'" *Daddy's Junky Music*

*Stores, Inc.*, 109 F.3d at 282 (quoting *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 600 (6th

Cir. 1991)). Sixth Circuit decisions are equivocal regarding the degree of presumed strength to be

accorded an incontestable mark. *Daddy's Junky Music Stores, Inc.*, *supra*, says "relatively strong,"

while other cases say that incontestable marks are presumed to be "strong." *See AutoZone, Inc. v.*

*Tandy Corp.*, 373 F.3d 786, 794 (6th Cir. 2004) (citing *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d

419, 422 (6th Cir. 1999)). In *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623 (6th Cir. 2002),

the court held that the presumption of strength arising from incontestable status does not necessarily

translate into a strong mark for purposes of a likelihood of confusion analysis:

9

> TSI's reliance upon this presumption is misplaced. Even where a trademark is incontestable and "worthy of full protection," the significance of its presumed strength will depend upon its recognition among members of the public. Treating a valid, incontestable trademark as an exceptionally strong mark for the purpose of determining whether confusion is likely to occur, without examining whether the mark is distinctive and well-known in the general population, would shift the focus away from the key question of "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowner's Group*, 931 F.2d at 1107. Although a trademark may be "strong and worthy of full protection" because it is valid and incontestable, *Wynn Oil Co.*, 839 F.2d at 1187, that does not necessarily mean that its strength is particularly relevant to the ultimate issue of whether confusion is likely to occur.
>
> TSI's trademark, although valid and incontestable, is not an especially strong mark. Not only is the mark descriptive, but it also lacks broad public recognition. As a result, this factor does not weigh strongly in TSI's favor.

*Id.* at 632. Moreover, the presumption of strength can be rebutted in a number of ways, including through extensive third-party use of similar marks.[2] *See AutoZone, Inc.*, 373 F.3d at 794.

As the Sixth Circuit has reaffirmed, the essence of a mark's strength in a likelihood of confusion analysis is its "distinctiveness." *Audi AG v. D'Amato*, 469 F.3d 534, 543 (6th Cir. 2006) (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985) ("The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore the more protection it is due.")). Taking its guidance from *Therma-Scan, Inc.*, the Court notes that Jimdi's mark, the herringbone or chevron design, is not very distinctive. As Defendants argue, and as Jimdi cannot deny, the herringbone pattern or design has been widely used for centuries as a pattern in countless items. Defendants identify a number of items in their brief using the herringbone pattern, and the Court, based upon its own cursory search of the internet, has found the pattern in wood floors, *see* http://www.wood-you-like-diy.co.uk/acatalog/herringbone_parquet.html; wallpaper, *see* http://discountdecorator.com/Paloma-Picasso.asp; quilts, *see*

---

[2]Defendants contend that the presumption can be rebutted if the mark falls within one of the categories above ranging from generic to arbitrary or fanciful, but this is an incorrect statement of the law, because arbitrary or fanciful marks are considered strong marks, and no presumption could arise for a generic mark because a generic mark is not eligible for registration.

http://beta.shopping.msn.com/results/shp/?text=herringbone%20quilts;   jewelry,   *see* http://www.amazon.com/14K-Gold-3-5mm-Herringbone-Bracelet/dp/B000K6CZIO, and shoes, *see* http://www.actionvillage.com.   These are only a small representation of the numerous items containing a herringbone design.  In short, there is nothing unique about Jimdi's mark.  Moreover, the Court finds that Jimdi's evidence is insufficient to show broad public recognition of its mark. For example, while Schrotenboer states in his affidavit that Jimdi has "expended considerable sums of money and spent substantial effort promoting the product shown in Exhibits 2, 3, and 5," (Schrotenboer Aff. ¶ 13), Jimdi has provided no evidence showing even an approximation of its advertising expenditures, nor has it provided any evidence of how it advertises its product.  More importantly, the evidence shows that Jimdi, itself, did not consider the herringbone design as indicative of Jimdi as the source of the deck flooring panels.  As set forth above, pursuant to the Agreement, the parties agreed that Serschen would remove the "Sure-Step" name and the design patent number from the Tool, indicating that the herringbone design was not particularly important to Jimdi.  This is confirmed by Schrotenboer's actions in connection with Defendants' removal of the Tool from Jimdi's facility.  Defendants' evidence, which is not in dispute, shows that prior to the date Defendants pick up the Tool from Jimdi's facility, Schrotenboer and Nelson Morren agreed that Morren Plastic would use the Tool to manufacture flooring panels only if Morren Plastic removed Jimdi's "Sure Step" logo and its design patent number from the Tool.[3]   This evidence shows that, to the extent that any feature of the product identifies Jimdi as the source, it is the mark "Sure Step" and/or the design patent but not the herringbone design.  Therefore, Jimdi's mark is a relatively weak mark.

---

[3]The Court notes that in filing its reply, Jimdi submitted affidavits from two dealers, but it failed to submit an additional affidavit from Schrotenboer to rebut Defendants' evidence.

11

### b.     Relatedness of the Goods

The Sixth Circuit has identified the following three categories for determining whether goods are related such that they may cause confusion:

> (1) direct competition of [goods], in which case confusion is likely if the marks are sufficiently similar; (2) [goods] are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) [goods] are totally unrelated, in which case confusion is unlikely.

*Homeowners Group, Inc.*, 931 F.2d at 1108.  Here, this factor weighs in favor of a likelihood of confusion because the goods are identical and compete directly.

### c.     Similarity of the Marks

It is undisputed that the marks – the repeating herringbone design – are identical.  While this fact would normally weigh strongly in favor of a likelihood of confusion, the Court concludes that it has less weight in this case because Defendants have apparently altered the Tool to remove the "Sure Step" name and the design patent – the only features of the product that could reasonably identify Jimdi as the source of the product – and have substituted the name "Insta-Dock" or "Twin Bay."  Thus, the Court will give this factor less weight in its analysis.

### d.     Evidence of Actual Confusion

Although there is no evidence of actual confusion, the lack of such evidence does not necessarily cut against a likelihood of confusion.  *See Daddy's Junky Music Stores*, 109 F.3d at 284. Defendants contend that there can be no actual confusion because it is very unlikely that customers for Jimdi's panels in the animal nursery and farrowing industry will be confused by Defendants' panels that are sold to the marine or boating industry.  Defendants argument, however, ignores the fact that Jimdi also sells its product to dealers in the boating industry.  Thus, actual confusion is possible, but because there is no evidence of actual confusion, this factor is inapplicable.

12

### e.      Marketing Channels Used

The parties appear to agree that there are similarities in the way they both market their respective goods, because they both use brochures, internet sites, and communications with dealers. The fact that Jimdi may also exhibit at trade shows, while Twin Bay does not, is not a significant fact.  However, it appears that the parties do not sell their products through the same dealers, which decreases the likelihood of confusion at the point of sale.  *See Therma-Scan, Inc.*, 295 F.3d at 636.

### f.      Likely Degree of Purchaser Care

"Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution." *Homeowners Group, Inc.*, 931 F.2d at 1111. A higher of standard of care applies "when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the [goods] at issue." *Id.*  However, "confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the [product] that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party." *Daddy's Junky Music Stores*, 109 F.3d at 286.

Given the fact that the predominant purchasers of the parties' products are builders and distributors at the wholesale level, they are more likely to exercise a greater degree of care than would a purchaser of the product at the retail level.  While it is true that the high degree of similarity of the herringbone mark might cause customers to pay less attention to detail, the potential for confusion is lessened by the fact that the parties do not share the same base of dealer-customers. Thus, this factor carries relatively little weight in the Court's analysis.

### g.      Defendants' Intent in Selecting the Mark

This factor is relevant if a party chooses a mark with the intent of causing confusion.  If such is the case, that fact by itself may be sufficient to support an inference of confusing similarity. *Wynn*

*Oil*, 839 F.2d at 1189.  Direct evidence of intentional copying is not necessary to prove intent.
*Daddy's Junky Music Stores*, 109 F.3d at 286.  "Rather, the use of a contested mark with knowledge
of the protected mark at issue can support a finding of intentional copying."  *Id.*

Jimdi argues that Defendants approached Jimdi, at least in part, "because they felt the
herring-bone pattern used by the company on its products was distinctive," and because they "saw
the product being universally adopted by other dock manufacturers throughout the state and nation."
(Pl.'s Br. at 14.)  However, it presents no evidence to support these assertions.  While Defendants
were obviously aware that Jimdi had registered the herringbone design as a trademark, and admit as
much, Serschen has stated in his affidavit that when he first approached Jimdi about building the
Tool for dock panels, he gave Schrotenboer a sample of the Thru-Flow pattern and asked
Schrotenboer to use it when building the Tool, but Schrotenboer used the herringbone design on his
own initiative.  (Serschen Aff. ¶¶ 11, 16.)  Thus, according to Serschen, it was Jimdi, not
Defendants, that selected the mark.  Also, contrary to Jimdi's assertion, it appears that Jimdi was not
producing or marketing products for sale to the marine industry prior to the time that it began
manufacturing panels for Twin Bay.  Moreover, it cannot be said that when Defendants later
removed the Tool from Jimdi's facility that their decision to do so was motivated by use of the
herringbone mark apart from the use of the Tool to produce the product.  Defendants had purchased
the Tool from Jimdi and, according to Defendants, believed that they were entitled to possess it.
Finally, as noted above, based upon the Agreement and Jimdi's conduct surrounding Defendants'
removal of the Tool from Jimdi's facility, it appears that the "Sure Step" name and the design patent
were more important to Jimdi than the herringbone mark.  Thus, this factor does not weigh in favor
of a likelihood of confusion.

14

### h.  Expansion of Product Line

This factor is not a part of the Court's analysis because neither party has presented any evidence indicting that either party intends to expand its business or that any such expansion would weigh in favor of a finding of likelihood of confusion.

### i.  Balancing of the Factors

In considering the foregoing factors, the Court notes that the factors weighing most strongly in favor of a conclusion of likelihood of confusion are the similarity of the marks and the similarity of the goods.  The goods are identical.  Regarding the marks, the herringbone pattern in the deck flooring panels is identical.  On the other hand, as set forth above, Jimdi's herringbone mark is fairly weak, and Jimdi failed to present any significant evidence that its mark has attained any degree of secondary meaning. In fact, as noted, based upon its conduct, it appears that Jimdi considered the "Sure Step" name and design patent to be more important indicators of Jimdi's goodwill and reputation than the herringbone design.  It is thus questionable whether the herringbone mark identifies Jimdi as the source of the product.  This factor is a strong indicator that confusion is unlikely to occur.  In addition, in the Court's opinion, the marketing channels factor shows that the parties do not deal with the same customers and, because there is insignificant overlap in customers, confusion is not likely.  In sum, the Court concludes that the weight of the factors favors a finding of no likelihood of confusion.  Thus, Jimdi has not shown a likelihood of success on this claim.

### 2.  Trade Dress Infringement

In order to establish a claim for trade dress infringement, a party must identify the particular elements that comprise the protectable trade dress and then must show by a preponderance of the evidence that: (1) its trade dress is distinctive in the marketplace; (2) its trade dress is primarily nonfunctional; and (3) the defendant's trade dress is confusingly similar to the plaintiff's protected

trade dress. *See Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 768 (6th Cir. 2005). The herringbone pattern in the flooring panels is the only element of trade dress that Jimdi asserts.

Regarding the first element, distinctiveness, the Sixth Circuit has observed that it comes in one of two forms. First, the mark or dress may be inherently distinctive, such as a penguin used by a publishing company. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635-36 (6th Cir. 2002). If not inherently distinctive, a mark or dress may acquire distinctiveness through secondary meaning. *See id.* at 636. The Sixth Circuit employs a seven-factor test for secondary meaning, which considers: "(a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying." *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 649 n.14 (6th Cir. 2002) (citations omitted). "To acquire a secondary meaning in the minds of the buying public, an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to 'who makes that article?'" *Esercizio v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1991) (internal quotation marks omitted).

Jimdi's herringbone pattern is not inherently distinctive. As noted above, the design has been used for centuries in and on a plethora of goods and items, including all types of flooring. One need simply look at parquet flooring or peruse the internet to find plenty of proof on this point. Jimdi must therefore rely upon secondary meaning, and its evidence in this regard is decidedly thin. Jimdi has presented no consumer survey evidence, which the Sixth Circuit "has historically favored . . . as proof of secondary meaning." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 419 (6th Cir. 2006). Instead, it relies upon Schrotenboer's affidavit to establish length and manner of use of

16

the trade dress, the amount of sales, Jimdi's established place in the market, and proof of copying. First, regarding length of use and exclusivity, the affidavit establishes that Jimdi has been using the herringbone design in deck flooring panels since 1989.  However, as Jimdi must acknowledge, prior to approximately 1998, its products were sold only in the farming and agricultural industries and not in the recreational industry.  Because Twin Bay's sales of its deck flooring are limited to the boating/recreational industry, the Court deems it more appropriate to consider Jimdi's length of usage as only going back to, at the earliest, 1998.  Second, regarding sales and advertising, the affidavit states that Jimdi has sold millions of dollars of product since 1989 and has expended considerable sums of money and spent substantial effort promoting its product.  (Schrotenboer Aff. ¶¶ 12-13.)  Third, regarding Jimdi's established place in the market, the affidavit states that "[t]he distinctive herring-bone or chevron-shaped hole pattern exemplified in Exhibits 2 and 5 have come to be recognized by the purchasing public as originating from Jimdi, Inc." (*Id.* ¶ 8.)  Finally, with regard to copying, as set forth above, the evidence shows that Jimdi selected the herringbone pattern for Defendants, not that Defendants copied the pattern.  In addition to the Schrotenboer affidavit, Jimdi relies upon two affidavits, from Michael Kane and Jeff Ifft, that Jimdi submitted in support of its trademark application.  Finally, Jimdi submitted two affidavits in connection with its reply brief, from Steven Bidstrup and Jim Starr, attesting to their familiarity with  Jimdi's deck flooring panels and the unique herringbone design.

In *Ashland Oil, Inc. v. Olymco, Inc.*, No. 94-5520, 1995 WL 499466 (6th Cir. Aug. 21, 1995), the plaintiff sued the defendant for infringing its registered mark "Instant Oil Change."  The defendant counterclaimed for cancellation of the mark.  Following a bench trial, the district court issued an order cancelling the registration because it concluded that the plaintiff failed to show that its mark had obtained secondary meaning prior to the defendant's first use of the mark.  The Sixth

Circuit held that the district court did not err in reaching its determination of no secondary meaning. The plaintiff had presented a consumer survey and other evidence to demonstrate secondary meaning. The district court rejected the plaintiff's survey because it showed that only a small percentage of the consuming public in the relevant area associated the name "Instant Oil Change" with a single source and because the survey was conducted two years after the defendant first began to use its mark. The Sixth Circuit concluded that the district court was not clearly erroneous in rejecting the survey. *See id.* at *4. The court of appeals also held that the district court did not err in concluding that the plaintiff's other evidence failed to establish secondary meaning. *See id.* at *5. That evidence showed that the plaintiff's sales in the area increased from $348,375 in 1987 to $1,503,544 in 1988 and $1,960,079 in 1989, that advertising expenditures were based upon a percentage of business, and that the plaintiff had used the phrase at least eight years prior to the defendant's first use. The court of appeals held that the advertising expenditures were not extensive and merely allowed the plaintiff to survive in the market, and the length of use, even combined with the level of advertising, was not enough to prove secondary meaning. *See id.*

Jimdi's evidence of secondary meaning falls short of what the plaintiff presented in *Ashland Oil, Inc.* First, Jimdi's evidence regarding its sales and advertising expenditures is too vague and insufficient to support a finding of secondary meaning. The fact that Jimdi has sold "millions of dollars of product" since 1989 tells this Court nothing about the level of its sales because millions could mean two million , twenty million, or two hundred million. Moreover, Jimdi fails to show how much of that number is attributable to sales of flooring in the boating industry, as opposed to agricultural or farming industries. Similarly, Jimdi's vague allegations regarding its advertising efforts and expenditure are both conclusory and insufficient to show any degree of effort to establish a connection in the minds of consumers between the herringbone pattern and Jimdi. Finally, the

18

affidavits that Jimdi has submitted are entitled to little weight.  The two affidavits from 1997 are from persons that were familiar with the use of Jimdi's product in the animal farrowing and nursery, not the boating or recreational industry.  Moreover, all of the affidavits were from persons from companies that purchased the product directly from Jimdi and, therefore, obviously knew that Jimdi's panels contained a herringbone design.  On the other hand, it is just as likely that persons or companies who have purchased decking panels from Twin Bay that contained the herringbone design as well as Jimdi's "Sure Step" mark had no idea that Jimdi manufactured the panels.  Finally, as discussed above, based upon the parties' dealings and the terms of the Agreement, it appears that the "Sure Step" name was of more significance to Jimdi than was the herringbone design as an identifier of Jimdi.  Accordingly, based upon its failure to present any significant evidence of secondary meaning, the Court concludes that Jimdi is not likely to succeed on its claim for trade dress infringement.

### 3.      Dilution

Jimdi's dilution claim arises under the federal antidilution statute, 15 U.S.C. § 1125(c)(1). Unlike infringement claims, a dilution claim is concerned with protecting the integrity and distinctiveness of the plaintiff's mark, not with likelihood of confusion.  *See Audi AG*, 469 F.3d at 547.  In other words, it prevents the user of the diluting mark from taking a free ride on the investment of the trademark holder.  *See Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 904 (9th Cir. 2002).  In order to succeed on a dilution claim, a plaintiff must show, among other things, that its mark is famous.  *See* 15 U.S.C. § 1125(c)(1).  Having concluded that Jimdi has failed to show that its herringbone design has attained secondary meaning, the resolution of this claim is straightforward because Jimdi's mark neither has inherent nor acquired distinctiveness and, therefore, cannot be famous.  *See TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88,

97-99 (2d Cir. 2001) (stating that "Congress envisioned that marks would qualify as 'famous' only if they carried a substantial degree of fame," such as "Dupont" or "Buick" or "Kodak"); *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999) ("Dilution is a cause of action invented and reserved for a select class of marks – those marks with such powerful consumer associations that even non-competing uses can impinge their value.") Jimdi's mark does not qualify as famous, and thus, it cannot succeed on this claim.

### 4.    Consent or License

Apart from failing to show a likelihood of success on the merits of its claims, Jimdi faces a substantial obstacle in proving that it did not acquiesce in Defendants using the herringbone design, whether through simple consent, an implied license, or a naked license.  At this juncture the Court need not identify the precise theory of Defendants' defense.  It is enough to note that there is ample evidence in the record before the Court to show that Jimdi consented to Defendants using the herringbone design in their decking panels.

Jimdi contends that the evidence shows that in spite of its sale of the Tool to Defendants, in which the trademark was embedded, the parties understood that Jimdi would retain the Tool in its possession to allow it to maintain its trademark rights.  It notes that the Agreement is silent on the issue of Jimdi's trademark and includes no provisions for royalties or quality standards for Defendants to meet that would ensure that Jimdi could maintain control over Defendants' use of the mark, as would be present in a standard license agreement.  Jimdi further asserts that the parties' conduct following the execution of the Agreement, with Jimdi retaining possession and control over the Tool for two years thereafter, evidences the parties' intent and understanding that Jimdi would retain possession of the Tool.  The problem with Jimdi's argument, of course, is that it completely ignores Jimdi's own conduct beginning in October 2006.  As the record now stands, the evidence

20

shows that Jimdi willingly parted with the Tool upon Defendants' request.  Although Schrotenboer states that "Jimdi objected to the removal of the Tool, indicating that the parties had an agreement," (Schrotenboer Aff. ¶ 33), there is no question that Jimdi could have refused to give Defendants the Tool, but the evidence shows that they made it readily available to Morren Plastic and even assisted in loading it into Morren Plastic's vehicle.  It is also interesting to note that in spite of its allegation that it objected to Defendants removing the Tool, Jimdi provides no contemporaneous documents supporting that allegation.  Rather, the only correspondence in the record is from Defendants' counsel and Morren Plastic, neither of which indicate any objection by Jimdi to the planned removal. More problematic for Jimdi, however, is its conduct in attempting to order decking panels from Defendants, knowing that Morren Plastic would be manufacturing them using the Tool.  To the extent that Jimdi asserts concerns over the quality of the product that Defendants will produce with the Tool, Jimdi's own conduct casts aspersions upon its sincerity.  Finally, as the Court noted early in this case, Jimdi took no action to prevent Defendants from using the Tool until several months after Defendants obtained it and after Defendants refused to fill Jimdi's orders for the product. While this case is in its early stages, the Court has no difficulty at this point in concluding that Jimdi has not shown a likelihood of disproving consent or acquiescence.

## B.     Irreparable Harm

Because the Court has concluded that Jimdi has not shown that it is likely to succeed on its claims, Jimdi's reliance upon *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595 (6th Cir. 1991), for the proposition that injunctive relief should normally follow upon a finding of likelihood of confusion, is misplaced.  Moreover, its assertion that irreparable harm is presumed in a trademark case when the trademark owner shows that it will lose control over its reputation pending trial, or more appropriately, its motivation for that assertion, is a bit suspect.  The evidence shows that Jimdi

21

was apparently not concerned with losing control over its mark when it let the Tool leave its building on October 23, 2006, that it was not concerned with losing control of its reputation when it submitted the November 27, 2006, pricing agreement for dock flooring to Defendants, and that it was not concerned with losing control of its reputation when it submitted its purchase order to Defendants on December 20, 2006.  In fact, it appears that Jimdi had no concern until after the Grand Rapids Boat Show in February 2007.  Jimdi simply has not persuaded this Court that it will suffer irreparable harm from Defendants' activities.

**C.     Harm to Others**

To the extent that the Court would grant Jimdi injunctive relief, it would certainly harm Defendants and their customers because they would be unable to obtain the decking panels.  In addition, Defendants, as the owners of the Tool, could not use it.  On the other hand, granting Jimdi's request would give Jimdi and its customers an unfair advantage over Defendant and its customers.  In short, Jimdi sold the Tool to Defendants and voluntarily released it to them with full knowledge that they would use it to produce decking panels.  This factor thus weighs against injunctive relief.

**D.     The Public Interest**

Jimdi asserts that the pubic interest is served by protecting a trademark owner's rights in its mark and by avoiding confusion in the marketplace.  Defendants, on the other hand, point out that the public interest would also be served by enforcing the parties' agreement and enforcing Defendants' property rights in the Tool.  Given the circumstances of this case, as well as the insignificant chance of confusion, the Court concludes that the public interest would not be served by granting the injunction.

22

**E.**      **Balancing the Factors**

In light of the Court's conclusions set forth above, the preliminary injunction factors weigh

strongly against granting Jimdi the requested injunctive relief.

## IV.  **Conclusion**

For the foregoing reasons, the Court will deny Jimdi's motion for a preliminary injunction.

An Order consistent with this Opinion will be entered.

Dated:  May 8, 2007                                    _____/s/ Gordon J. Quist_____
                                                          GORDON J. QUIST
                                                        UNITED STATES DISTRICT JUDGE